IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL KEARNS,
    *Plaintiff*,

v.

NORTHROP GRUMMAN
SYSTEMS CORPORATION,
    *Defendant*.

Civil Action No. ELH-11-1736

**MEMORANDUM OPINION**

Plaintiff Michael Kearns alleges that his former employer, defendant Northrup Grumman Systems Corporation ("Northrup Grumman"), violated Title VII of the Civil Rights Act of 1964, codified, as amended, at 42 U.S.C. §§ 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*  *See* Second Amended Complaint ("SAC," ECF 44).  In particular, Kearns claims that he was subjected to adverse employment actions and a hostile work environment in retaliation for his opposition to workplace discrimination against a co-worker, and for filing his own complaint regarding discrimination.  Kearns, who was 66 years old during the events relevant to this case, also alleges that he was subjected to a hostile work environment because of his age, in violation of the ADEA.

Currently before the Court is defendant's Motion for Summary Judgment ("Motion," ECF 55), supported by a Memorandum of Law ("Memo," ECF 55-1), and exhibits.  Plaintiff filed a response in opposition ("Opp." or "Opposition", ECF 62), also with exhibits.[1]  Defendant

_____

[1] Kearns's arguments in opposition to summary judgment do not precisely track the allegations set forth in the SAC.  For example, the SAC appears to set forth a claim for constructive discharge under the ADEA.  However, Kearns's Opposition does not address

replied ("Reply," ECF 63), and submitted additional exhibits.  No hearing is necessary to resolve

the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I will grant the Motion.

## Factual Summary[2]

Kearns, a Caucasian, began working for Northrop Grumman in 2002 as a Help Desk

Analyst.  *See* Deposition of Michael Kearns ("Kearns Dep.," ECF 55-2) at 12.[3]  At the time

Kearns began working for defendant, he signed an Employment Agreement, which provided, in

relevant part: "I will work any shift . . . to which I am assigned."  Ex. 1 to Kearns Dep.  In

September 2006, Kearns became an Incident Handler, also known as an Incident Analyst, within

Northrop Grumman's Security Incident and Analysis Center ("SIAC").  *Id.* at 15.  Incident

Analysts are responsible for identifying suspicious activity on Northrop Grumman's IT network.

*See* Ex. 6 to Kearns Dep.  The manager of the SIAC was Grant Jewell, and Kearns's shift

manager was Mike Mundi.  *See* Ex. 5 to Kearns Dep.; Kearns Dep. at 16, 31.

On March 26, 2007, Jewell drafted a performance assessment for Kearns for the 2006

calendar year.  Jewell wrote, Ex. 4 to Kearns Dep.:

> Michael Kearns joined the SIAC from the helpdesk at ES and . . . his
> learning curve is greater coming into Information Security because of his lack of
> experience in networking and incident response.  Michael has displayed his
> dedication to the job asking the appropriate questions and ensure he reports to
> work even through difficult times.  Michael has been a good addition to the team

---

constructive discharge; he indicates that his claim under the ADEA is a hostile work
environment claim.

[2] The facts set forth are undisputed, unless otherwise noted.  As required in the context of a
motion for summary judgment, I have construed the facts in the light most favorable to
plaintiff.

[3] In August 1999, Kearns began working for a company that apparently was acquired by
Northrop Grumman.  In terms of his length of employment with defendant, he received credit for
his work dating from August 1999.  ECF 55-2 at 12.

he just needs to focus a little further on attention to detail when completing RT tickets.

However, by February 2008, Jewell and Mundi had less favorable views of Kearns.  On February 27, 2008, Mundi emailed Jewell about Kearns, stating, Ex. 5 to Kearns Dep.:

> I have done the best I can to work with Michael Kearns. . . .  I now give up on trying to work with him because it is rather counter productive.  What is even worse is his demeanor when tasked.  He is constantly mumbling, swearing and in so doing, makes our work environment uncomfortable.  I have talked to him about this before, but again he does not hold on to what I say for long.   This is frustrating for me and I really hate giving up on people.

Jewell responded to Mundi the same day.  He advised: "This is something I'm addressing with Mary Jo from HR and we are putting together a performance improvement plan. . . .  If he isn't able to turn around the performance after being presented with the PIP then we will address this accordingly via HR."  *Id.* at 5.

Shortly thereafter, Jewell gave Kearns a "Below Expectations" performance rating on his annual evaluation for the 2007 calendar year.  *See* Kearns Dep. at 36.  On March 18, 2008, Jewell placed Kearns on a Performance Improvement Plan ("PIP").  *See* Ex. 6 to Kearns Dep. The PIP stated that Kearns had "not progressed along the learning curve as expected," did "not follow the outlined procedures," and should be "identifying a higher volume of suspicious activity in the system."  *Id.*  The PIP also noted that Kearns's "stats are among the lowest in the department."  *Id.*

In addition, a number of SIAC employees complained about plaintiff making inappropriate comments in the workplace.  *See* Exs. 7–9 to Kearns Dep.  Jewell gave plaintiff a written warning in March 2008 and, in December 2008, issued a Final Written Warning to Kearns regarding his inappropriate comments. Kearns Dep. at 39–40. In the Final Written

Warning, Jewell noted that plaintiff had made "an extremely disrespectful comment" on November 20, 2008, which violated Northrop Grumman's policy against "[u]sing epithets, slurs, or explicit or offensive language directed at persons or protected characteristics." Ex. 8 to Kearns Dep. The Final Written Warning provided: "Any future incidents of this nature or failure to abide by company policies, procedures, and conduct standards will result in your termination from the company." *Id.*

In early 2009, Jewell gave Kearns a "Below Expectations" performance rating for the 2008 calendar year. *See* Kearns Dep. at 37. And, Jewell placed Kearns on another PIP on April 22, 2009. *See* Ex. 7 to Kearns Dep. Once again, the PIP noted that Kearns had not progressed along the learning curve as expected, did not follow procedures, should have identified a higher volume of suspicious activity, and was rated at the bottom of the department. *Id.*

In May 2009, Kearns and the other SIAC members were moved to the Cyber Security Operations Center ("CSOC") in Annapolis Junction, Maryland. Kearns Dep. at 45. After the move, Jewell assigned plaintiff and another employee, Jeannette Simpkins,[4] the task of "server log monitoring." Kearns Dep. at 46. In this role, rather than looking for suspicious activity on Northrop Grumman's networks, Kearns and Simpkins were responsible for monitoring the system logs for all of the servers within Northrop Grumman and attempting to find anomalies and infected servers. *See* Deposition of Roderick Press, Kearns's supervisor from July 2009 through Kearns's termination ("Press Dep.," ECF 55-4) at 36. Kearns and Simpkins were assigned to work a shift from 12:00 p.m. to 8:30 p.m. Kearns Dep. at 17.

---

[4] Plaintiff identifies Ms. Simpkins's first name as "Chiquita." *See* Opp. at 4, ¶ 2. In a suit filed by Simpkins in this Court, CCB-10-3523, and in her Affidavit, ECF 62-2, Ms. Simpkins uses the first name of Jeanette.

Roderick Press, "a middle age black male," Opp. at 2, replaced Jewell as manager of the CSOC in July 2009 and became Kearns's supervisor.  *See* Kearns Dep. at 45.  Kearns described Press's managerial style as "intimidating" and testified that other employees also found Press to be intimidating.  *Id.* at 49.  Similarly, Mundi testified that Press utilized a "military style of management," had a "strong personality," and could be "very patronizing."  Deposition of Michael Mundi ("Mundi Dep.," ECF 55-5) at 17.

Press gave Kearns a "Meets Expectations" evaluation for the 2009 calendar year.  Ex. 12 to Kearns Dep.  As a result of the evaluation, Kearns received a raise for the first time since March 2007.  Kearns Dep. at 58–59.

Press emailed Kearns on April 26, 2010, asking Kearns to confirm that Press had discussed with Kearns and Simpkins that "there may be a change in the direction of the Server Security Log monitoring."  Ex. 22 to Kearns Dep.  Kearns confirmed that he and Press had discussed the topic, but wrote that he "cannot speak for Jeanette and [does] not feel comfortable commenting about her role on things."  *Id.*  Kearns forwarded the email chain to Human Resources on April 30, 2010, claiming, *id.*:

> [Press] has continuously used intimidation tactics to pull me in and turn me against Jeanette Simpkins. . . .  Per the following email he did not provide additional information that took place during our conversation and questioning me in regards to her.  Rod has threatened that if I do not go against Jeanette that he will place me on a 30 day PIP.  I do not feel comfortable with this type of intimidating/harassing behavior to turn me against my co worker Jeanette that I work with on a daily basis . . . .  It appears since I did not reply to his [attached] email in according to his liking on Monday, that he has constantly made intimidating comments such as "Are you my Corporate Spy."

Kearns sent another email to Human Resources on May 4, 2010, claiming that Press "is continuing to harass [him]" and "made degrading comments of [Kearns's] job knowledge."  *Id.*

Stacey Wyland, an employee in Northrup Grumman's HR department, emailed Kearns to "set up some time to talk" about Kearns's concerns.  Ex. 23 to Kearns Dep.  In his reply, Kearns stated: "In all due respect, I do not feel comfortable discussing conditions with you.  This is based on several incidents of Rod berating another employee.  I have witnessed these incidents on more than one occasion."  *Id.*  Kathy Floyd, another HR employee, also reached out to Kearns.  Floyd and Kearns met on May 17, 2010, but the meeting "lasted for less than 5 minutes" before Kearns told Floyd that "everything I need to say is in the emails" and then walked out of the office.  *Id.*

On May 3, 2010, Kearns filed a charge of discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC"), Ex. 39 to Kearns Dep. at 6, which he supplemented on July 8, 2010.  *Id.* at 7.  In the initial charge, Kearns stated, *id.* at 6:

> Recently, a co-worker had filed a formal complaint of abusive treatment against my Supervisor.[5]  As a result I believe I have been unjustly implicated in the issues that have occurred between the Supervisor and my co-worker.  I am now being subjected to retaliatory treatment from Mr. Press.  The retaliation has taken the form of being intimidated, subjected to a hostile work environment, and threatened with disciplinary actions. . . .   Furthermore, I have been asked on several occasions about my plans to retire; therefore, this leads to me believe Mr. Press has taken issue with me and may be subjecting me to age discrimination.

Press sent Kearns an email on May 5, 2010, expressing disapproval of Kearns's job performance.  *See* Ex. 25 to Kearns Dep.  In particular, Press questioned Kearns's "job awareness," expressed concern about Kearns's failure to follow guidelines, and pointed out Kearns's "lack of knowledge and lack of initiative."  *Id.*  Additionally, Press noted his

---

[5] Ms. Simpkins was the co-worker to whom Kearns made reference.  At some point in 2010, Simpkins filed an EEOC charge of discrimination against Press, alleging retaliation and hostile work environment.  *See* Affidavit of Jeanette Simpkins, ECF 62-2 ¶¶ 2, 4.  She had previously filed a complaint with EEOC in 2008, pertaining to alleged "gender discrimination," unrelated to Mr. Press.  *Id.* ¶ 2.

displeasure at Kearns's practice of "recording what [Press says] in a green notebook" and then "sharing [Press's comments] with third parties." *Id.* The next day, May 6, 2010, Press sat with Kearns at his desk and reviewed a number of issues related to Kearns's job duties and performance. *See* Press Dep. at 67, 70–71; Ex. 31 to Kearns Dep.; Kearns Dep. at 150. Press also wrote a summary of the meeting, in which he noted that "Kearns needs to show significant improvement . . . in his ability to apply accepted industry methodology to event detection and analysis, improve his situational awareness . . . , and follow [] policies, processes and guidelines for event detection and triage." Ex. 31 to Kearns Dep. Press added that he had not "seen the initiative and commitment from Mr. Kearns to excel in his current role. Mr. Kearns may be able to function in another area under [Northrop Grumman] and that opportunity should be explored . . . ." *Id.*

Floyd contacted Kearns on June 9, 2010, to talk further with him about Press. Ex. 26 to Kearns Dep. According to Floyd, Kearns told her that "things were going good" and that he wanted to "hold off" on further discussing the situation. *Id.* Kearns met with Floyd again on June 28, 2010. *See* Ex. 27 to Kearns Dep. According to Kearns, he was courteous in the meeting and "answered what he felt were the direct relevant elements." Kearns Dep. at 125. Kearns again directed Floyd to various emails he had already provided to HR and asked Floyd not to contact him (Kearns) again. Kearns Dep. at 126; *see* Ex. 27 to Kearns Dep.

Nevertheless, plaintiff and Floyd met again on July 23, 2010. Ex. 29 to Kearns Dep. According to Floyd's notes, Kearns detailed numerous complaints about Press, most of which relate to above-described incidents or other similar encounters in which Press questioned Kearns's efficiency and/or effectiveness. *Id.* Kearns also told Floyd that "he felt like there is

age discrimination" because "he's the oldest person in the section and that all the new people seem to be college age.  He feels he is perceived as slower and that doesn't help him."  *Id.* Kearns told Floyd that in October of 2009, Press asked Kearns when he was going to retire, and that in January 2010, a different Northrup Grumman employee asked him the same question.  *Id.*

As noted, Press had previously advised Kearns about a "change in the direction of the server log monitoring team."  Ex. 22 to Kearns Dep.  Press's plan was to reintegrate Kearns and Simpkins with the rest of the Incident Analysts and not to limit server log monitoring to the hours between noon and 8:30 p.m.  *See* Kearns Dep. at 131–32.  Press explained at his deposition that he wanted to reintegrate Kearns and Simpkins into the overall analyst team "rather than just having two individuals that were responsible for covering [all] three shifts."  Press Dep. at 88; *see* Kearns Dep. at 131–32.  Press sent Kearns and Simpkins an email on June 3, 2010, asking them which shift they would like to work once they were reintegrated with the rest of the team. *See* Ex. 32 to Kearns Dep.

The ensuing email chain between Press, Kearns, and Simpkins was somewhat contentious; Press insisted that Kearns and Simpkins provide an immediate response, while Kearns and Simpkins repeatedly requested extra time to decide their shift preference.  *Id.*  At one point, Press wrote that Kearns had previously informed him that "he preferred to work 2nd shift," *i.e.,* from 4:00 p.m. to 12:30 a.m.  *Id.*  Kearns requested that Press forward him the email to which he referred; Press responded: "The email was sent by you.  I apologize if you cannot find it but I will not forward the email."  *Id.*  On June 28, 2010, Press again asked Kearns and Simpkins to let him know which of the three standard shifts in the CSOC they wanted to work after their reintegration on July 31, 2010.  Ex. 33 to Kearns Dep.; *see* Kearns Dep. at 160.

Kearns did not respond to this email because he "was going to wait and see what [Press] did on July 31st to try and make adjustments." Kearns Dep. at 162. Plaintiff's shift did not change on July 31, 2010. Kearns Dep. at 160.

Kearns and Press were involved in another dispute in July of 2010. Kearns enrolled in a job-related course with Learning Tree and requested approval from Press. *See* Ex. 13 to Kearns Dep. Press disapproved the request because "proper procedures were not followed," but because of a miscommunication, Kearns was never notified of the disapproval. *See* Ex. 14 to Kearns Dep.; Kearns Dep. at 68, 74. Kearns attended the course and, upon his return to the office, was informed by Press that he would have to account for the time spent in the course as personal/vacation time and that the course would have to be paid for through Ed Assist, Northrop Grumman's tuition assistance program, as opposed to another source of training funds, Training Advantage. *See* Ex. 15 to Kearns Dep. Tuition assistance through Ed Assist was contingent on the employee remaining with Northrup Grumman for at least one year after the course, whereas assistance through Training Advantage was not subject to reimbursement. Kearns Dep. 71–72. Eventually, and with the help of Northrup Grumman's Human Resources team, the dispute was resolved in Kearns's favor—the time would be marked as "Training" rather than "Personal/Vacation" and the tuition would be paid through the Training Advantage program. *See* Exs. 15–16 to Kearns Dep.

Floyd contacted Kearns on August 13, 2010, and asked him to attend a meeting to discuss the findings of her investigation into Kearns's complaints about Press. Ex. 35 to Kearns Dep. Plaintiff refused to attend, advising that "the concerns with Rod are still ongoing!" *Id.*

On August 16, 2010, Press provided Kearns with an Interim Performance Evaluation. Ex. 17 to Kearns Dep.  The evaluation did not contain an overall rating, but instead included ratings in a number of different individual categories.  *Id.*  Press rated Plaintiff "Meets Expectations" in eight categories and "Below Expectations" in two categories.  *Id.*  Press also told Kearns that he was going to put him on another PIP because his work was "subpar." Press Dep. at 27.  However, Press never actually placed  Kearns on a PIP.  Kearns Dep. at 80–81.

Press approached Kearns on August 18, 2010, and informed him that he would be moved to the third shift, from 11:00 p.m. to 7:30 a.m.  *See* Ex. 34 to Kearns Dep.  In an email to Floyd, Kearns described the interaction as follows, *id.*:

> Today Rod came to my desk and without warning about 2:20 p.m. and brusquely informed me I would be going to 3rd shift after labor day.  That is the 11 PM to 7:30 AM shift.  When I protested, he said that's where my need is and walked away.  Subsequently (15 minutes later) he sent me an e-mail asking me to detail the reasons why that shift would not work for me.  I told him it would be an extreme financial hardship to do so and also that I was originally 2nd shift. . . . About 30 minutes after I sent him that response, Rod came to my desk and verbally in a loud voice demanded private information in my financial and personal life.  When I said that he had no right to ask such questions he said "I am asking you as your manager[.]"  He then started harassing me as to how many tickets I had done today.
>
> I told him "I do not feel comfortable with the way you are asking me these questions.  I wish you would stop[.]" I said this in the way school kids are asked to respond to a bully.  When he kept talking in a harassing and intimidating manner, I could feel my heart rate increasing and that I did not feel well.  I indicated I need to leave for the day.  He quipped "Are you taking your vacation now?"
>
> As I left he followed me out into the hall and demanded that I clean up my desk area.  He bellowed that if I did not, he would have the few binders I had neatly stacked on the desk put in the trash can by the janitor.  I removed the binders, mopped up the desk top with some watered napkins and departed.  I felt extremely angry and dizzy and fear coming in tomorrow.

> In all the 11 years I have worked for Northrup Grumman, I have never been so intimidated and harassed by such an abusive manager. It stupefies me why he is still here and supported by the company.

Although Press told Kearns that Kearns was moving to the third shift, Kearns's shift never actually changed. Kearns Dep. 168.

Kearns's last day of work at Northrop Grumman was August 27, 2010, and he ultimately retired in March 2011.[6] Plaintiff testified that he did not feel he could return to work in any part of Northrop Grumman because he had a "general feeling" that he was a "marked man." Kearns Dep. at 180. Kearns received a "right to sue" letter from the EEOC on March 30, 2011.

Additional facts are included in the Discussion.

## Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514,

---

[6] The parties do not cite any evidence in the record to substantiate these dates, and I have found none. However, defendant includes the dates in its "Statement of Facts as to which There is no Genuine Dispute," *see* Memo at 10, and plaintiff did not interpose any objection. Moreover, the SAC states that Kearns was employed by Northrup Grumman "until August 27, 2010." SAC ¶ 5. In any event, the precise date that Kearns left Northrup Grumman's employ is not material to the issues in the Motion.

522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex Corp.*, 477 U.S. at 322–24. Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 248. In other words, "[f]actual disputes that are irrelevant . . . will not be counted." *Id.*

In resolving a motion for summary judgment, a district court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Baltimore Ctr. For Pregnancy Concerns, Inc. v. Mayor and City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). Moreover, in resolving a summary judgment motion, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

Fed R. Civ. P. 56 "is a mechanism to obviate trial . . . ." *Boyer-Liberto v. Fontainbleau Corp.*, ____ F.3d ____, No. 13-1473, slip op. at 9 (4th Cir. May 13, 2014). As the Fourth Circuit recently observed, "'the very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine issue for trial.'" *Boyer-Liberto*, slip op. at 8-9 (quoting Advisory Committee's notes to Fed. R. Civ. P. 56) (emphasis in *Boyer-Liberto*). In supporting or opposing summary judgment, a party must rely on facts that would be admissible at trial. *Id.* at 9. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Anderson,* 477 U.S. at 248. But, "the mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252.   And, a court must award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.*   Of import here, the court should "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

**Discussion**

Kearns alleges three types of employment discrimination.   First, he alleges that his employer retaliated against him for his refusal to join in the workplace discrimination and retaliation against a co-worker, and for opposing it, in violation of Title VII.   Second, he alleges that, in violation of Title VII, he was subjected to a hostile work environment, also in retaliation for opposing and complaining about workplace discrimination.   Third, he alleges that he was subjected to a hostile work environment because of his age, in violation of the ADEA. Defendant disputes Kearns's allegations on numerous grounds.

*1.   Title VII Framework*

Title VII prohibits an employer from, *inter alia*, taking an "adverse employment action" against "any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e–2(a)(1); *see Freeman v. Dal-Tile Corp.*, No. 13-1481, slip op. at 13 (4th Cir. May 1, 2014).   The Supreme Court has referred to discrimination based on one of these five characteristics as "status-based discrimination." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, ___U.S. ___, 133 S. Ct. 2517, 2525 (2013).

Title VII also contains an antiretaliation provision that "prohibits an employer from retaliating against an employee who exercises his Title VII rights." *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 600 (D. Md. 2011), *aff'd*, 465 Fed. App'x 274 (4th Cir. 2012); *see generally Nassar*, 133 S. Ct. at 2525–27; *Okoli v. City of Baltimore,* 648 F.3d 216, 223 (4th Cir. 2011). The purpose of Title VII's antiretaliation provision is to "[m]aintain[] unfettered access to statutory remedial mechanisms" for employees who fear reprisal. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). Thus, an employer violates Title VII by taking an adverse employment action against an employee because that employee exercised his rights under Title VII.

In addition to prohibiting discrete acts of discrimination, Title VII prohibits "the creation or perpetuation of a discriminatory work environment." *Vance v. Ball State Univ.*, ___ U.S. ___, 133 S. Ct. 2434, 2440 (2013). An actionable hostile work environment exists when "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Boyer-Liberto*, *supra*, slip op. at 11–12 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

When a plaintiff claims that he has been subjected to discrimination or retaliation, there are "two avenues" at trial by which he may prove that an adverse employment action amounts to intentional employment discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc). The first is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'" *Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted). "To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated

purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original).

The second avenue available to the plaintiff is to follow the burden-shifting approach articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* scheme is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n. 2 (4th Cir. 1989) (citation omitted).

Under the *McDonnell Douglas* proof scheme, the plaintiff at trial must first establish, by a preponderance of the evidence, a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n. 13, the plaintiff is generally required to show that the employer took adverse action against an employee who was qualified for employment, "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If the plaintiff establishes a prima facie case, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650

F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant" and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510–11. Stated another way, if the employer produces evidence that could persuade a fact finder that it had a legitimate, non-discriminatory reason for its actions, "the defendant has done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case," and therefore, "whether the plaintiff really did so is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711 (1983).

When the defendant meets his or its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516–20; *Adams v. Trustees of Univ. of North Carolina–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

The relevance of the *McDonnell Douglas* scheme outside of the trial context is limited, however. The Fourth Circuit has admonished district courts at the summary judgment stage to "'resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination *vel non*.'" *Merritt*, 601 F.3d at 295 (quoting *Proud v. Stone*,

945 F.2d 796, 798 (4th Cir. 1991)) (alterations in *Merritt*; internal quotation marks omitted). Further, the Fourth Circuit has observed that, "[n]otwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of 'the ultimate question of discrimination *vel non*.'" *Id.* at 294–95 (citation omitted). Nevertheless, the Fourth Circuit has referred to the *McDonnell Douglas* proof scheme in analyzing the propriety of an award of summary judgment. *See, e.g.*, *Warch v. Ohio Casualty Insurance Co.*, 435 F.3d 510 (4th Cir. 2006).

### 2. Retaliation

Section 2000e-3(a) of 42 U.S.C. provides: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." The elements of a prima facie claim of retaliation are: "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Coleman v. Md. Ct. of Appeals,* 626 F.3d 187, 190 (4th Cir. 2010); *see also Boyer-Liberto*, *supra*, slip op. at 18; *Okoli*, *supra*, 648 F.3d at 223; *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).

With regard to the first element of the prima facie claim for retaliation, "[a] protected activity is one in which the employee opposes an employment practice on the ground that it violates Title VII." *Johnson v. Giant Food, Inc*., No. Civ. JFM–00–3465, 2000 WL 1831962, *6 (D. Md. Nov. 27, 2000); *see also Simmons v. Shalala,* 946 F. Supp. 415, 420 (D. Md. 1996). As the Fourth Circuit has explained, "in the context of a retaliation claim, a 'protected activity' may

fall into two categories, opposition and participation." *EEOC v. Navy Federal Credit Union,* 424 F.3d 397, 406 (4th Cir. 2005), *cert. denied,* 547 U.S. 1041 (2006).  "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metropolitan Washington Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998).  Protected oppositional activity "may include 'staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities,' as well as 'complain[ts] . . . about suspected violations'" of Title VII.  *Id.* (citations omitted).  And, the Fourth Circuit has held that the filing of an EEOC complaint generally constitutes protected activity.  *See, e.g.*, *King v. Rumsfeld,* 328 F.3d 145, 151 (4th Cir. 2003), *cert. denied*, 540 U.S. 1073 (2003); *see also Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994).

Critically, however, "opposition activity is protected [only] when it responds to an employment practice that the employee *reasonably believes* is unlawful."  *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 338 (4th Cir. 2006) (emphasis in original); *see Boyer-Liberto v. Fontainbleau Corp.*, ____ F.3d ____, No. 13-1473, slip op. at 11–12 (4th Cir. May 13, 2014).  In other words, a plaintiff's complaint to Human Resources or to the EEOC will not qualify as a "protected activity" unless the plaintiff had an objectively reasonable belief that the challenged employment action violated Title VII.

In *Boyer-Liberto*, for example, the plaintiff claimed she was fired in retaliation for complaining to HR about her supervisor using a racial epithet on two occasions.  The Fourth Circuit held that the plaintiff's HR complaint did not constitute protected activity because

plaintiff did not have an "objectively reasonable belief" that the supervisor's sporadic use of racial epithets violated Title VII.  *See Boyer-Liberto*, slip op. at 20.  The court said, *id.*: "In short, we conclude that [plaintiff] could not have had an objectively reasonable belief that, in complaining to management about the two related conversations, she was complaining about conduct that was unlawful . . . under Title VII."

Similarly, in *Jordan*, 458 F.3d at 337, the plaintiff complained to his supervisors about an offensive statement made by a co-worker.  After the plaintiff was fired, he filed suit under Title VII, alleging that he was discharged in retaliation for complaining about the co-worker's statement.  *Id.*  In rejecting the plaintiff's claim, the Fourth Circuit first noted that "the only conceivable unlawful employment practice that Jordan could have been opposing [by complaining to his supervisors] was a hostile work environment."  *Id.* at 339.  According to the court, however, "no objectively reasonable person could have believed that [the] office was in the grips of a hostile work environment or that one was taking shape."  *Id.* at 341.  Accordingly, the plaintiff's complaint to his supervisors did not constitute protected opposition activity.

The second element of the prima facie case for retaliation is an "adverse employment action."  In the context of a status-based discrimination claim, the Fourth Circuit has explained: "An adverse employment action is a discriminatory act that adversely affects the terms, conditions, or benefits of a plaintiff's employment."  *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (internal quotation marks, citation, and alterations omitted).  The Court has described an "adverse employment action" as one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in

benefits.'"  *Hoyle*, 650 F.3d at 337 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

In a retaliation claim, however, the standard for an adverse employment action is more lenient than for a status-based discrimination claim.  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). Nevertheless, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Id.* at 67.  Even under the "lower bar" applicable to Title VII retaliation claims, a plaintiff must show that a reasonable employee would have found the challenged employment action "materially adverse," which "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68 (internal quotation marks omitted).

The action must be *materially* adverse because "it is important to separate significant from trivial harms."  *Id.*; *see Csicsmann v. Sallada*, 211 F. App'x 163, 168 (4th Cir. 2006) ("[T]his is still a heavy burden for the plaintiff: the alleged adverse action must be *material.*" (emphasis in original)).  And, the materiality requirement reflects the fact that Title VII "does not set forth a general civility code for the American workplace" or protect against "petty slights, minor annoyances, and simple lack of good manners."  *Burlington Northern*, 548 U.S. at 68 (internal quotation marks omitted); *see Thorn v. Sebelius*, *supra*, 766 F. Supp. 2d at 600.

As Judge Paul Grimm of this Court recently noted, "none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station;

considering the employee 'AWOL'; or issuing a personal improvement plan, 'an "Attendance Warning," 'a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" *Wonasue v. University of Maryland Alumni Ass'n*, ___ F. Supp. 2d ___, 2013 WL 6158375, at *10 (D. Md. Nov. 22, 2013) (quoting *Rock v. McHugh,* 819 F. Supp. 2d 456, 470–71 (D. Md. 2011)); *see Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757, 784 (D. Md. 2010) ("While an alleged adverse employment action need not be so severe and pervasive that it alters the terms or conditions of employment, it nonetheless must be materially adverse.").

The third element of the prima facie case, that the protected activity was causally connected to the employer's adverse action, requires a plaintiff to "establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 133 S. Ct. 2517 at 2534. Mere temporal proximity is not necessarily enough to create a jury issue as to causation. "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001)) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

In this case, Kearns alleges that he was retaliated against for engaging in two allegedly protected activities. Specifically, he claims that he 1) refused "to join Mr. Press in his unlawful gender discrimination and retaliation" against Simpkins; and 2) filed a charge of discrimination with the EEOC on May 3, 2010. Opp. at 11–12. Kearns further alleges that, in retaliation for

those activities, Press took adverse employment actions against him.  Kearns's retaliation claim fails because, *inter alia*, he cannot satisfy the first two of the elements of the prima facie case.  In other words, Kearns did not engage in a protected activity and Kearns did not suffer an adverse employment action.

First, Kearns did not engage in a protected activity.  The first protected activity in which Kearns claims he engaged was "his refusal to join Mr. Press in his unlawful gender discrimination and retaliation" against Simpkins.  Opp. at 11–12.  In particular, Kearns claims that "Mr. Press sought the assistance of Plaintiff in retaliating against Ms. Simpkins on or about April 21, 2010." *Id.* at 12.  The incident to which Kearns refers occurred when Press emailed Kearns, writing, Ex. 22 to Kearns Dep.:

> I am writing to confirm our conversation from Friday, April 23, 2010 concerning the Server Security Log Monitoring effort.  Have I held discussions with you and Jeanette [Simpkins] about the execution of the Server Security log monitoring?  Have I discussed with you and Jeanette there may be a change in the direction of Server Security Log monitoring?  Finally, have these discussions occurred on more than one occasion?

Kearns responded by writing, *id.*: "You and I have discussed the execution and direction of server log monitoring on at least one occasion.  I cannot speak for Jeanette and do not feel comfortable commenting about her role on things."  According to Kearns, this email response constituted protected activity under Title VII.

However, Kearns's email response was not "protected activity" as that term is used in Title VII.  It is true that opposing unlawful discrimination against a co-worker can be a protected activity under Title VII.  *See Laughlin*, 149 F.2d at 259.  But, as the Fourth Circuit explained in *Boyer-Liberto* and *Jordan*, such opposition only qualifies as protected activity if the plaintiff had an "objectively reasonable" belief that he was opposing conduct that violated Title VII.  *See*

*Boyer-Liberto*, slip op. at 20; *Jordan*, 458 F.3d at 338.   Here, it was not objectively reasonable for Kearns to believe that, by responding to Press's email, he "was complaining about conduct that was unlawful . . . under Title VII."   *Boyer-Liberto*, slip op. at 20.   The conduct Kearns ostensibly opposed was an innocuous email from Press requesting confirmation that a conversation had taken place.   Nothing about Press's email comes close to violating Title VII. Thus, Kearns could not have had an objectively reasonable belief that Press's email violated Title VII.   As a result, Kearns's email response to Press was not protected opposition activity.

The second opposition activity in which Kearns claims he engaged was filing his Charge with the EEOC.   To be sure, the filing of an EEOC complaint generally constitutes protected activity.   *See, e.g.*, *King*, *supra*, 328 F.3d at 151.   However, the Charge here does not qualify as protected activity because Kearns did not have an objectively reasonable belief that the conduct about which he complained in the Charge violated Title VII.   *See Boyer-Liberto*, slip op. at 20.

The Charge, which was filed on May 3, 2010, made two substantive allegations of illegal discrimination, neither of which was objectively reasonable.   First, it alleged that Press had retaliated against Kearns because of Kearns's above-described email, in which Kearns declined to confirm that Simpkins had been present for a conversation about the future of the server log monitoring team.   As I have already discussed, it was not objectively reasonable for Kearns to believe that Press's email violated Title VII.   Therefore, it was not objectively reasonable for Kearns to believe that his email in response was protected activity.

The Charge further alleged that Press and another employee, Verina Davis-Terry, discriminated against Kearns because of his age.   In the Charge, Kearns wrote: "I have been asked by Mr. [P]ress on October 15, 2009 and by his day Team Lead [sic] who reports to him

(Ms. Verina Davis-Terry) in January 2010 about my plans to retire."  Kearns's contention in the Charge that these two questions violated Title VII's prohibition on workplace discrimination is entirely frivolous.  As in *Jordan*, "the only conceivable unlawful employment practice that [Kearns] could have been opposing" by mentioning the age-related comments in his Charge was a hostile work environment.  *Jordan*, 458 F.3d at 339.  However, as I will discuss more thoroughly in the context of Kearns's hostile work environment claim, these two innocuous questions do not come close to establishing a hostile work environment based on Kearns's age.

If Kearns believed that the two questions violated Title VII, his belief was not objectively reasonable.  Thus, the Charge does not qualify as protected activity because Kearns did not have an "objectively reasonable belief" that the comments about which he complained violated Title VII.  Therefore, his claim that he was retaliated against for engaging in protected activity cannot survive summary judgment.

Even assuming, *arguendo*, that Kearns had engaged in protected activity, his claims would still fail because he has not identified any materially adverse employment action taken against him.

Kearns alleges that "Press commenced a series of conduct and actions calculated to punish Plaintiff for refusing to join in the retaliation against Ms. Simpkins and [pursuing] his EEOC claim filed on May 3, 2010."  Opp. at 12.  In particular, Kearns claims that the following actions were "materially adverse": (1) "Press threatened Plaintiff that he would be placed on a [PIP]"; (2) Press "made disparaging comments about Plaintiff[] for 'siding with' Jeanette Simpkins and also criticized Plaintiff's work"; (3) Press expressed displeasure with Kearns's practice of recording Press's comments in a notebook; (4) Press "accused Plaintiff of [s]leeping,

taking extended breaks, disorderly desk area, which were not documented in any form"; (5) Press told Kearns that Press planned to "disband the Server Log Monitoring team" and move Kearns to a different shift; and (6) Press initially denied Kearns's request to attend the Learning Tree course.  *See* Opp. at 12–15.  However, none of the acts identified by Kearns are "materially adverse" as that term is used in the context of a Title VII retaliation claim.

As noted, placing an employee on a PIP is not materially adverse.  *Wonasue*, 2013 WL 6158375, at *10.  It follows that a mere threat to do so is not adverse, either.  Likewise, making disparaging comments or expressing displeasure about an employee's performance are not materially adverse.  *See Burlington Northern*, 548 U.S. at 68 (occasional "abusive language" is insufficient to show retaliation); *Cepada v. Bd. of Educ. of Balt. Cnty.*, 814 F. Supp. 2d 500, 515 (D. Md. 2011) ("[Plaintiff's] allegations that he was yelled at . . . and 'criticized' . . . are not materially adverse actions.  Nor is [plaintiff's] allegation that the school threatened to officially reprimand him . . . ."); *Tawwaab*, 729 F. Supp. 2d at 784 ("[D]emeaning and disparaging comments by a supervisor . . . do not constitute an adverse employment action.").

Further, even if disbanding the Server Log Monitoring team and changing Kearns's shift would be materially adverse, Kearns concedes that "Press did not disband the Server Log Monitoring Unit" or change Kearns's shift.  Opp. at 13; *see* Kearns Dep. at 168.  Finally, although Press initially told Kearns that he would have to use his vacation days for the Learning Tree course, Press later apologized for the miscommunication.  And, he allowed Kearns to label the time as "training" instead of vacation.  *See* Ex. 15 to Kearns Dep.; Kearns Dep. at 75. [7]

---

[7] Although I do not reach the issue, Kearns likely cannot satisfy the third element of the prima facie case, which requires a plaintiff to "establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  *Nassar*, 133 S. Ct. 2517 at 2534.

Press's management style and actions may have offended, perturbed, or irked Kearns. But, as indicated, Title VII "does not set forth a general civility code for the American workplace." *Burlington Northern*, 548 U.S. at 68. And, "an employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

In sum, Kearns has not set forth evidence from which a reasonable jury could conclude that he has established a prima facie case for retaliation. Accordingly, I will grant summary judgment to defendant with respect to Kearns's retaliation claim.

### 3. Hostile Work Environment - Retaliation

A claim of hostile work environment is premised on the notion that "an employee's work environment is a term or condition of employment." *EEOC v. Central Wholesalers, Inc.,* 573 F.3d 167, 174 (4th Cir. 2009) (internal citations and quotation marks omitted). To set forth a hostile work environment claim based on retaliation under Title VII, a plaintiff must show that "'(1) he experienced unwelcome harassment; (2) the harassment was [in retaliation for protected conduct]; (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.'" *Wells v. Gates*, 336 F. App'x 378, 387 (4th Cir. 2009) (quoting *Baqir v. Principi*, 434 F.3d 733, 745–46 (4th Cir. 2006)) (alteration in *Wells*); *see Pueschel v. Peters*, 577 F.3d 558, 564–65 (4th Cir. 2009); *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d

---

Kearns's work performance had been criticized numerous times by previous supervisors before any allegedly protected activity, making it unlikely that Press's dissatisfaction with Kearns's work was motivated entirely by retaliatory animus.

781, 790–91 (D. Md. 2013); *see also EEOC v. Xerxes Corp.*, 639 F.3d 658, 668 (4th Cir. 2011); *Okoli*, *supra*, 648 F.3d at 220.

As the Supreme Court explained in *Harris*, 510 U.S. at 22, a court must examine "all the circumstances" to determine whether an employer has created an abusive working environment, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See also Boyer-Liberto,* slip op. at 12; *Okoli*, 648 F.3d at 220.  Notably, "[t]his element of a hostile work environment claim has both subjective and objective components." *Cent. Wholesalers*, 573 F.3d at 175; *see Bonds v. Leavitt,* 629 F.3d 369, 385 (4th Cir. 2009).  A plaintiff must show that she "did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Cent. Wholesalers,* 573 F.3d at 175.  "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'  Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted).

Kearns alleges that defendant, through Press, subjected him to a hostile work environment because Kearns opposed Press's unlawful discrimination and retaliation against Simpkins and because Kearns filed a charge of discrimination with the EEOC.  Opp. at 11–12.  However, as discussed, Kearns has not identified any protected activity in which he engaged.

Therefore, his claim that he was subjected to a hostile work environment in retaliation for engaging in protected activity cannot survive summary judgment.[8]

### 4.  Hostile Work Environment - ADEA

As noted, Kearns also alleges that he was subjected to a hostile work environment because of his age, which he claims violated the ADEA.  *See* 29 U.S.C. § 623; Opp. at 17.  The ADEA does not expressly prohibit the creation of a hostile work environment, however.  Nor has the Fourth Circuit expressly held that a claim of hostile work environment is actionable under the ADEA.  Nonetheless, the Fourth Circuit has "assumed, without deciding, that a hostile work environment claim is generally cognizable under the ADEA for plaintiffs age forty or older." *Baqir*, 434 F.3d at 746 n.14; *see Burns v. AAF-McQuay, Inc.*, 166 F.3d 292, 294 (4th Cir. 1999); *Causey v. Balog*, 162 F.3d 795, 801 n.2 (4th Cir. 1998)); *see also Wells*, 336 F. App'x at 387. And, defendant does not dispute that a cause of action exists when a plaintiff alleges that he was

---

[8] Defendant also argues that the alleged harassment was not sufficiently severe or pervasive to constitute a hostile work environment.  Because I rule that Kearns has not engaged in any protected activity, I need not address this argument.

In any event, the incidents about which plaintiff complains are not sufficiently severe or pervasive to rise to the level of a hostile work environment.  *See, e.g.*, *Combs-Burge v. Rumsfeld*, 170 Fed. App'x 856, 862 (4th Cir. 2006) ("[A]ssigning individuals remedial tasks to correct their job performance and assigning individuals to difficult jobs are not objectively abusive actions, particularly considering that we 'do[] not sit as a kind of super-personnel department weighing the prudence of employment decisions made by [employers] charged with employment discrimination.'") (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)) (alterations in original).  Indeed, the incidents at issue are far from the conduct necessary to establish actionable harassment.  *Compare, e.g., Collier v. Ram Partners, Inc.*, 159 F. Supp. 2d 889 (D. Md. 2001) (denying summary judgment for employer as to plaintiff's claim of hostile work environment where (1) racial epithets were used repeatedly; (2) were coupled with physical threats; and (3) evidence supported the conclusion that racial epithets were knowingly tolerated by management) *with Hall*, 2012 WL 3536755, at *11 (concluding that criticism of plaintiff's job performance, accusation that plaintiff intentionally broke her own laptop, and requirement that plaintiff submit weekly faxes to report her visits and distribution of product samples to physicians did not constitute actionable harassment).

subjected to a hostile work environment because of his age.  Accordingly, I will assume that such a cause of action exists.

In addressing hostile environment claims under the ADEA, the Fourth Circuit has relied, in part, on the standards for hostile work environment claims under Title VII.  *See, e.g.*, *Burns*, 166 F.3d at 294; *see also Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996) ("Bearing the similarity of the ADEA and Title VII in mind, then, it is unsurprising that the standards, methods, and manner of proof established in Title VII case law are persuasive authority in cases arising under the ADEA, and that courts routinely employ Title VII and ADEA case law interchangeably.").  Moreover, the parties rely on Title VII cases in addressing the ADEA hostile work environment claim.  *See* Memo at 22; Opp. at 17–20.  Accordingly, I will rely on Title VII hostile work environment jurisprudence in evaluating Kearns's ADEA hostile work environment claim.

In order to establish a claim for hostile environment under the ADEA, Kearns must show (1) that he is at least 40 years old; (2) that he was harassed based on his age; (3) that the harassment had the effect of unreasonably interfering with his work, creating an environment that was both objectively and subjectively hostile or offensive; and (4) that he has some basis for imputing liability to his employer.  *Wells*, 336 F. App'x at 387; *see also Baqir*, 434 F.3d at 746; *Burns*, 166 F.3d at 294.

With regard to the second element, an employee is harassed "based on" his age if, but for his age, he would not have been the victim of the discrimination.  *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009) ("To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of

the employer's adverse decision."); *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000) (Title VII case); *Hoyle*, 650 F.3d at 331 (Title VII case).  But, "harassment due to personality conflicts will not suffice.  Some persons, for reasons wholly unrelated to [age], manage to make themselves disliked." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008) (Title VII case).  Therefore, in order to survive summary judgment, there must be sufficient evidence for a reasonable jury to conclude that the alleged harassment stemmed not from personal animosity, workplace competition, or general boorishness, but rather from age-based animus.

The record in this case does not contain sufficient evidence from which a reasonable jury could conclude that Kearns's work environment was made hostile because of age discrimination. Kearns points to only two instances in which supervisors mentioned Kearns's age.  On both occasions, innocuous questions were posed about when Kearns planned to retire.  These questions, standing alone, cannot establish that the workplace was permeated with age-based animus.  Indeed, "a company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct." *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992).  Moreover, Kearns does not allege that Press used any derogatory language regarding Kearns's age or made any uncouth comments about Kearns's age.

In essence, all Kearns has done is assert that he is over 40 years old and that his workplace was unpleasant, but he has done nothing to show that one matter is connected to the other.  Thus, even if Kearns's work environment were "hostile," any hostility cannot, on this

record, be attributed to age-based animus.[9]   Accordingly, I will grant summary judgment to defendant with regard to Kearns's ADEA claim.

### CONCLUSION

For the foregoing reasons, I will grant summary judgment to defendant.  A separate Order follows, consistent with this Memorandum.


Date: May 23, 2014                                         _____/s/_____
                                                          Ellen Lipton Hollander
                                                          United States District Judge

---

[9] As with plaintiff's Title VII hostile work environment claim, defendant also argues that the alleged harassment was not sufficiently severe or pervasive to constitute a hostile work environment.   Because I rule that no reasonable jury could conclude that Kearns's work environment was made hostile because of age-based animus, I need not address this argument.